1   ERIC GRANT
    United States Attorney
2   MICHAEL D. ANDERSON
    ROSANNE RUST
3   KATHERINE T. LYDON
    Assistant United States Attorneys
4   501 I Street, Suite 10-100
    Sacramento, CA 95814
5   Telephone: (916) 554-2700

6   ALEXANDRE DEMPSEY
    Trial Attorney
7   Public Integrity Section
    U.S. Department of Justice
8   1301 New York Avenue, NW
    Washington, D.C. 20530

9
    Attorneys for Plaintiff
10  United States of America

**FILED**

**Nov 7, 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

11                    IN THE UNITED STATES DISTRICT COURT

12                      EASTERN DISTRICT OF CALIFORNIA

13

14  UNITED STATES OF AMERICA,          CASE NO.    2:25-cr-0258 TLN

15              Plaintiff,             18 U.S.C. § 1349 – Conspiracy to Commit Bank
                                       Fraud and Wire Fraud; 18 U.S.C. § 1344 – Bank
16         v.                          Fraud (11 counts); 18 U.S.C. § 1343 – Wire Fraud (6
                                       counts); 18 U.S.C. § 371 – Conspiracy to Interfere
17  DANA WILLIAMSON,                   with Governmental Function and Obstruct Justice;
                                       26 U.S.C. § 7206(1) – Subscribing to a False Tax
18              Defendant.             Return (3 counts); 18 U.S.C. § 1001(a)(2) – False
                                       Statements; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A),
19                                     982(a)(3), 26 U.S.C. §§ 7301, 7302, and 28 U.S.C.
                                       § 2461(c) – Criminal Forfeiture
20

21

22                              I N D I C T M E N T

23  COUNT ONE: [18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud and Wire Fraud]

24         The Grand Jury charges:

25                              DANA WILLIAMSON,

26  defendant herein, as follows:

27  ///

28  ///

INDICTMENT                              1

## I.    INTRODUCTION

At all times relevant to the Indictment:

### A.    The Conspirators

1.    DANA WILLIAMSON was the founder and owner of Company A.  WILLIAMSON, through Company A, provided public affairs, lobbying, and political consulting services to entities attempting to influence decision making in California government.  In or about late 2022, WILLIAMSON left her private employment and accepted a position as the Chief of Staff to a California elected official.  She held that position until in or about December 2024.

2.    Co-Conspirator 2 was a former California public official, and the founder and owner of Company B.  Through Company B, Co-Conspirator 2 provided consulting services to those seeking to influence legislation and decision making in California government.

3.    Greg Campbell, charged by Information in case number 2:25-cr-0252-TLN, was a registered lobbyist and a founding member of Company C, a hub for public affairs, campaign, crisis management, communications and lobbying firms in California.  Campbell also founded and owned Company D, a lobbying company that represented clients seeking to influence legislation and decision making in California government.

4.    Sean McCluskie, charged by Information in case number 2:25-cr-0253-TLN, was a federal employee serving as the Chief of Staff to Public Official 1.  As the Chief of Staff to Public Official 1, McCluskie had significant influence over federal decision making and contracts.  In that position, he was also bound by federal ethics and disclosure rules regarding outside income and employment.  McCluskie resided near both Sacramento, California and Washington, D.C., traveling back and forth between the two locations from 2022 through 2024.

5.    Co-Conspirator 5 ("McCluskie's spouse") was a stay-at-home parent, who had prior work experience in the media industry.

### B.    The Dormant Campaign Funds

6.    Public Official 1 was a federal public official but had previously held other federal and California state positions.  McCluskie had worked for Public Official 1 for many years while Public Official 1 held a variety of public offices.  Based on the prior relationship and McCluskie's position as

1  Chief of Staff, McCluskie had a relationship and position of trust with respect to Public Official 1 and

2  Public Official 1's campaign organization.

3        7.     Immediately prior to accepting his federal appointment, Public Official 1 served in a

4  California state elected office. As a state elected official, Public Official 1 maintained one or more bank

5  accounts containing campaign contributions that were designated for future electoral campaigns.

6        8.     When Public Official 1 entered federal office, federal ethics rules prohibited Public

7  Official 1 from actively engaging in campaign-related activities. To comply with these rules, Public

8  Official 1 stopped campaign activity, allowing his state campaign account to become dormant. Public

9  Official 1 moved the existing state campaign funds to a new campaign account for a future campaign.

10  In these accounts (collectively, "the dormant campaign accounts" or the "campaign accounts"), the

11  funds were to be used for basic account maintenance and not for any active campaign-related activity.

12  Public Official 1 delegated to McCluskie responsibility for arranging for the funds in the dormant

13  campaign accounts to be monitored and overseen by a third party.

14        9.     Law Firm 1 was a California-based law firm that specialized in providing legal advice

15  related to campaign finance laws and regulations and in managing campaign accounts. It was led by

16  Lawyer 1, an experienced legal practitioner, and employed a number of lawyers and non-lawyer

17  employees. Law Firm 1 oversaw the dormant campaign accounts for Public Official 1, issued payments,

18  and prepared campaign financial disclosures that were required under California state law.

19       10.    Before Law Firm 1 would issue a payment from the dormant campaign accounts, Law

20  Firm 1 required authorization of the payment or recurring payments. Law Firm 1 would review the

21  payments and the payments' stated purpose to ensure compliance with rules and regulations regarding

22  expenditure of campaign funds. Law Firm 1, however, was not responsible for ensuring that the

23  services or goods billed were, in fact, provided. Nor was Law Firm 1 responsible for conducting

24  independent research into the purpose of the expenditures. Instead, McCluskie, or a person designated

25  by McCluskie, was responsible for authorizing payments and ensuring that the payments were for goods

26  and services that were provided as stated. Except for the payments that are the subject of the charges in

27  this Indictment, payments from the dormant campaign accounts were typically for small amounts for

28  expenses such as website maintenance and minor office expenditures.

1      11.    When a payment was approved, or a previously-approved recurring payment invoiced,

2  Law Firm 1 would authorize payment from the dormant campaign accounts.  The dormant campaign

3  account funds were held at Bank 1.

4      12.    Bank 1, as well as Bank 2, Bank 3, Bank 4, Bank 5, and Credit Union 1, were financial

5  institutions as defined in Title 18, United States Code, Section 20.

6          **II.**    **THE CONSPIRACY AND ITS OBJECTS**

7      13.    From in or about February 2022, through in or about September 2024, in Sacramento, El

8  Dorado, and Yolo Counties, within the State and Eastern District of California, and elsewhere,

9  WILLIAMSON did knowingly and intentionally combine, conspire, confederate, and agree with Co-

10  Conspirator 2, Campbell, McCluskie, and Co-Conspirator 5, and others known and unknown to the

11  Grand Jury to commit offenses against the United States, with each offense constituting an object of the

12  conspiracy, to wit:

13        a.    To knowingly execute and attempt to execute, a scheme and artifice to obtain any

14      of the moneys, funds, credits, assets, securities, and other property owned by, and under the

15      custody and control of, a financial institution, by means of materially false and fraudulent

16      pretenses, representations, promises, half-truths and the omission of material facts for which

17      there was a duty to disclose, that is, Bank Fraud, in violation of Title 18, United States Code,

18      Section 1344(2).

19        b.    To knowingly devise, intend to devise, and participate in a material scheme and

20      artifice to defraud and to obtain money by means of materially false and fraudulent pretenses,

21      representations, promises, half-truths, and the omission of material facts for which there was a

22      duty to disclose, and to cause interstate and foreign wire transmissions, that is Wire Fraud, in

23      violation of Title 18, United States Code, Section 1343.

24      14.    The purpose of the conspiracy and scheme to defraud was to steal money from Public

25  Official 1's dormant campaign accounts for McCluskie's own benefit.  The money taken from the

26  dormant campaign accounts was covertly funneled through companies controlled by WILLIAMSON,

27  Co-Conspirator 2, and Campbell to hide the money's origin and avoid detection.  Then it was disguised

28  as pay to McCluskie's spouse for a "no-show" job and transferred into an account controlled by

1 | McCluskie.

2 | ### III.    MANNER AND MEANS

3 | In furtherance of the conspiracy, the conspirators employed, among others, the following manner

4 | and means:

5 | **A.    Initial Agreement**

6 | 15.    In or about February 2022, WILLIAMSON, who was working in public affairs and

7 | lobbying, and McCluskie, who was a federal employee, met and discussed McCluskie's desire to have

8 | more money while continuing to work as Chief of Staff to Public Official 1.

9 | 16.    McCluskie and WILLIAMSON agreed that WILLIAMSON would bill Public Official

10 | 1's dormant campaign account for purported consulting services for overseeing the account at a rate of

11 | $7,500 per month. This money was intended to subsidize $10,000 payments that WILLIAMSON would

12 | make each month to benefit McCluskie financially.

13 | **B.    Conduit Payments**

14 | 17.    Beginning in or about April 2022, as agreed, WILLIAMSON paid $10,000 per month to

15 | Company C, an entity which was consistently controlled by Campbell, with, at times, WILLIAMSON or

16 | Co-Conspirator 2, over and above any payments she would otherwise make to Company C. Company

17 | C, through a third-party payroll services provider, then paid $10,000 per month into a bank account

18 | McCluskie controlled. These payments were disguised as income to McCluskie's spouse for work

19 | supposedly done for WILLIAMSON. In fact, McCluskie's spouse did not do any work for

20 | WILLIAMSON, Company A, or Company C, and McCluskie's spouse did not communicate with

21 | WILLIAMSON once the paperwork was completed to initiate the payments.

22 | 18.    In or about November and December 2022, as WILLIAMSON was preparing to reenter

23 | state government service, WILLIAMSON arranged for Co-Conspirator 2 to join the conspiracy in order

24 | to take over WILLIAMSON's role in concealing the payments to McCluskie. In early 2023, Co-

25 | Conspirator 2 began billing the dormant campaign account for purported consulting services at a rate of

26 | $10,000 per month, at WILLIAMSON's direction. Typically, once Co-Conspirator 2's company

27 | (Company B) received the money, Co-Conspirator 2, or someone at Co-Conspirator 2's direction, would

28 | deposit the money into an account at Bank 2. Co-Conspirator 2 would then pass the $10,000 payment

through to Company C. In some instances, Co-Conspirator 2 would pass through the money before receiving it from the dormant campaign account. Company B's payments to Company C were generally disguised by inflating the amount of rent and overhead Company B paid Company C each month, increasing the purported rent payments from approximately $10,700 to $20,700. Company C, which was consistently controlled by Campbell, with, at times, WILLIAMSON or Co-Conspirator 2, would then pay $10,000 through a third-party payroll provider into an account McCluskie controlled at Credit Union 1. These payments continued to be disguised as pay for work supposedly performed by McCluskie's spouse for Co-Conspirator 2. McCluskie's spouse, however, did not do work for Co-Conspirator 2, Company B, Company C, or Campbell.

19.    The flow of the money from the dormant campaign accounts to McCluskie is represented, in summary, graphically below:



C.    **False Statements and Omissions**

20.    As part of the conspiracy, and in furtherance of their scheme, the conspirators made and caused others to make materially false and fraudulent pretenses, representations, promises, half-truths, and the omission of material facts for which there was a duty to disclose because of WILLIAMSON and McCluskie's ongoing relationship of trust with Public Official 1, his dormant campaign and the campaign's law firm, Law Firm 1, to initiate and continue payments from the dormant campaign accounts.

21.    The false statements and omissions included those made by McCluskie and WILLIAMSON to Public Official 1. For example, McCluskie had conversations with Public Official 1 to initially set up the payments and again when Co-Conspirator 2 replaced WILLIAMSON as the conduit. In those discussions, McCluskie informed Public Official 1 that $10,000 per month was a reasonable amount to pay for monitoring the dormant campaign accounts and that WILLIAMSON, and

1  later Co-Conspirator 2, were willing to take on the role. McCluskie also told Public Official 1 that

2  McCluskie's spouse had obtained employment working with Company A. McCluskie and

3  WILLIAMSON, however, intentionally misrepresented and concealed material facts from Public

4  Official 1, including falsely representing that the money from the dormant campaign accounts was

5  payment for consulting services to WILLIAMSON and, later, Co-Conspirator 2. McCluskie and

6  WILLIAMSON also omitted and concealed that the money was being passed through to McCluskie's

7  spouse, that his spouse was not doing any work, that his spouse was not working for any other clients of

8  her purported employers, and that the payments from the dormant campaign accounts were not for the

9  purpose of obtaining consulting services but were rather a means to personally enrich McCluskie.

10  McCluskie and WILLIAMSON made these misrepresentations and omissions because they believed,

11  correctly, that Public Official 1 would not have permitted the payments if Public Official 1 had known

12  the truth.

13       22.    WILLIAMSON and McCluskie also effectuated the scheme through false statements and

14  omissions to Lawyer 1 and Law Firm 1. The invoices WILLIAMSON and Co-Conspirator 2 submitted

15  to Law Firm 1 to initiate the payments from the dormant campaign accounts were false and misleading

16  in that they claimed the money they were paid was for WILLIAMSON and Co-Conspirator 2 providing

17  consulting services to the campaign. In fact, the money was not being paid for those services; instead,

18  the money was being paid so that it could be passed through to McCluskie. Had Law Firm 1 known the

19  true facts, it would not have made the payments.

20       23.    To make it appear to Law Firm 1 as though the invoices from WILLIAMSON and Co-

21  Conspirator 2 were for legitimate services rendered, McCluskie would personally approve or have his

22  spouse approve the invoices. In doing so, the personal relationship between McCluskie and his spouse,

23  who had a different surname, was not disclosed to employees at Law Firm 1. This omission was

24  material in that it made it less likely that Law Firm 1 would ask additional questions, discover the illegal

25  nature of the scheme, and refuse to issue payments.

26      **D.**    **Additional False Statements and Omissions**

27       24.    To further support the scheme and prevent or delay its detection, the conspirators also

28  made, or caused others to make, materially false statements and omissions in state campaign financial

1   disclosures, to government ethics counsel, and to the media.

2        25.    As alleged above, McCluskie, WILLIAMSON, and Co-Conspirator 2 provided false and

3   misleading information about the dormant campaign expenses, including through emails and invoices

4   sent to Law Firm 1's employees.  In addition to using this information as described above to issue

5   payments from the dormant campaign accounts, Law Firm 1 used this information to prepare California

6   Fair Political Practices Commission ("FPPC") Form 460 campaign disclosures.  Because the

7   information provided to Law Firm 1 was false and misleading, Law Firm 1 prepared Form 460s that

8   falsely reported that the monthly campaign expenditures to WILLIAMSON and Co-Conspirator 2 were

9   for campaign consultant services.  The Form 460s were then reviewed by McCluskie and/or Public

10  Official 1 and publicly filed with the California Secretary of State.  This created the false appearance of

11  propriety and legal review related to the payments, which furthered the scheme by making it less likely

12  that it would be detected by Public Official 1 and Law Firm 1, either directly, or through public or media

13  scrutiny of the arrangement.

14       26.    Likewise, when McCluskie sought ethics approval for his spouse's employment from the

15  counsel's office at the federal department where he was Chief of Staff, McCluskie intentionally

16  concealed that the employment was for a no-show job and that his spouse's pay would come from

17  money passed through a conduit scheme from Public Official 1's dormant campaign funds.  Instead,

18  McCluskie affirmatively misrepresented that his spouse would be working as a "communications

19  consultant" "advising on digital ad placements and misc. communications for political campaigns."

20       27.    This was not just a misrepresentation that McCluskie's spouse would be working when

21  she was not; it was also part of the misrepresentation about who she would be doing work for and how

22  she was getting paid.  Communications consulting for political campaigns was a job that was

23  unnecessary and illegal for the dormant campaign because Public Official 1 was prohibited from

24  campaigning while serving in a high-level appointment in the federal government.  By claiming that his

25  spouse was performing that type of work, McCluskie, in effect, represented that his spouse was doing

26  work that was unconnected to Public Official 1's dormant campaign accounts.  As a result of these false

27  statements and omissions, McCluskie obtained ethics approval for his spouse's purported employment.

28  This further created an unwarranted aura of legitimacy around the payments, including reducing the

1  likelihood of objections from Public Official 1 who expected that ethics counsel would be consulted
2  about the propriety of the purported employment relationship.

3      28.     In or about April 2024, WILLIAMSON, after consulting with one or more co-
4  conspirators, also approved a false and misleading statement for Law Firm 1 to provide in response to a
5  press inquiry.  In the statement, Law Firm 1 repeated false information about Co-Conspirator 2's
6  consulting work for the campaign and concealed the pass-through nature of the scheme, which was
7  unknown to Law Firm 1.  This was done in furtherance of the objects of the conspiracy, since it, among
8  other things, helped evade detection of the scheme and allowed it to continue.

9      **E.    Coordination and Cover-Up**

10     29.     WILLIAMSON also worked to coordinate among the members of the scheme when their
11 interests might not otherwise align.  For example, when McCluskie's spouse refused to sign a backdated
12 contract in the Spring of 2024, WILLIAMSON told McCluskie that she would talk to Co-Conspirator 2
13 and take care of it.

14     30.     It was further a part of the manner and means of the conspiracy and scheme that the
15 conspirators worked together to avoid detection.  WILLIAMSON, Campbell, and Co-Conspirator 2 met
16 and communicated on several occasions in 2024, in varying combinations, to discuss ending or
17 continuing the scheme, to share information pertinent to maintaining the secrecy of the scheme from
18 unknowing participants and outsiders, and to reinforce the bond of secrecy among themselves.
19 WILLIAMSON, McCluskie, and Co-Conspirator 2 also met and communicated in varying combinations
20 on several occasions in 2024 for the same purpose.  For example, on or about July 29, 2024, when
21 WILLIAMSON, Campbell, and Co-Conspirator 2 discussed the scheme prior to Co-Conspirator 2
22 interacting with Lawyer 1 regarding the payments from the dormant campaign accounts, Co-Conspirator
23 2 asked WILLIAMSON if Lawyer 1 was aware of the scheme.  WILLIAMSON answered, quietly
24 whispering, "no."

25     31.     Likewise, later in the conversation, Campbell reinforced the importance of not having
26 payments from the campaign account to Co-Conspirator 2 end at the same time the payments to
27 McCluskie's spouse stopped.  Instead, Campbell suggested paying McCluskie's spouse for a few more
28 months than Co-Conspirator 2 billed the campaign.  The extra payments, Campbell suggested, would

make it appear as though the two sets of payments were unconnected, thereby helping to conceal that the purpose of the dormant campaign account payments was so that they could be passed through to McCluskie.

32.     When the scheme ended in or about September 2024, McCluskie, with the help of WILLIAMSON, Campbell, Co-Conspirator 2, and Co-Conspirator 5, had stolen approximately $225,000 of campaign funds for MCCLUSKIE's own use.

## IV.     OVERT ACTS

In furtherance of said conspiracy and to accomplish its objects, although not required to prove the offense, at least one of the conspirators committed, or caused to be committed, in the State and Eastern District of California, the following overt acts, among others:

33.     On or about February 18, 2022, WILLIAMSON and McCluskie met in person at a restaurant near midtown Sacramento, California, where they began planning the scheme.

34.     On or about February 22, 2022, McCluskie and WILLIAMSON exchanged text messages regarding the scheme:

| | |
|---|---|
| McCluskie: | Talked to [Public Official 1]. He wanted me to talk to you. Let me know when is a good time to call. |
| WILLIAMSON: | I'm scared. |
| McCluskie: | I can talk now. Don't be scared. |
| WILLIAMSON: | Call me |

35.     On or about February 22, 2022, McCluskie called WILLIAMSON's phone. The call was connected for approximately 20 minutes.

36.     On or about March 9, 2022, WILLIAMSON and McCluskie texted about delays involving Law Firm 1:

| | |
|---|---|
| McCluskie: | Staying or leaving is complicated and happy to talk more. Is there a way to get [Lawyer 1] moving like [Public Official 1] or myself calling him? |
| WILLIAMSON: | I didn't tell him it was for you |
| WILLIAMSON: | I called again this am |
| McCluskie: | BTW, I don't want you paying for this. I appreciate it. |

37. On or about March 10, 2022, McCluskie texted WILLIAMSON that "[Public Official 1] wants to know a reasonable amount to pay someone to manage his accounts . . . he is looking for an example of some firm that puts in writing that this is what they would charge."

38. On or about March 14, 2022, WILLIAMSON met with Public Official 1 at McCluskie's encouragement.

39. Following WILLIAMSON's meeting with Public Official 1, on or about March 14, 2022, WILLIAMSON texted Lawyer 1, "Hey. Talked to [Public Official 1] so give me a call when you can."

40. On or about March 17, 2022, WILLIAMSON texted Lawyer 1, "Let's do 7500. Start March 1 ongoing with 30 day out."

41. On or about March 18, 2022, McCluskie emailed WILLIAMSON seeking information that he could provide to ethics counsel at MCCLUSKIE's federal employer regarding his spouse's purported employment with Company A.

42. On or about March 21, 2022, McCluskie texted WILLIAMSON, "I sent you an email with the questions that [Federal Agency] will want an answer [on]. . . . We can move on hiring [my spouse] before that process plays out. It would be best for us if [she] is hired as an employee so I do not have to figure out taxes. Let me know what I have to provide to you to get the process started."

43. On or about March 28, 2022, WILLIAMSON emailed McCluskie information to provide to ethics counsel regarding McCluskie's spouse's purported employment with Company A. WILLIAMSON stated that McCluskie's spouse would be "Advising on digital ad placements and misc. communications for political campaigns."

44. On or about March 28, 2022, McCluskie texted WILLIAMSON asking, "How do we move [my spouse] forward with getting [her] hired on? I have some commitments to make so I am just trying to make sure we are good for March."

45. A few days later, on or about April 1, 2022, WILLIAMSON responded to McCluskie and said, "You are good for March. Give [your spouse] my contact and I'll get it all set up."

46. On or about April 5, 2022, McCluskie texted WILLIAMSON to ask, "Is there any chance you could pay [my spouse] this week for March? We are making monetary commitments for travel and I want to make sure I have the resources. Thanks."

47.     On or about April 20, 2022, McCluskie repeated the information provided by WILLIAMSON on or about March 28, 2022, in an email to ethics counsel.

48.     On or about August 8, 2022, WILLIAMSON or someone acting at her direction emailed Lawyer 1 an invoice for $45,000 requesting payment for "Consulting" "Account Maintenance (March – August 2022)."

49.     On or about August 19, 2022, in reply to an email chain from Lawyer 1 asking, "Can you confirm that we are authorized to make this $45,000 payment to [WILLIAMSON] for consulting fees," McCluskie emailed stating that WILLIAMSON's invoice was approved, "Yes.  It is approved. [Pronoun representing Public Official 1] wanted to compensate her for her work with the campaign accounts."

50.     On or about November 2, 2022, WILLIAMSON called McCluskie.  The call was connected for approximately eight minutes.

51.     On or about November 2, 2022, WILLIAMSON initiated a group text message chain introducing Co-Conspirator 2 to McCluskie.

52.     On or about November 2, 2022, MCCLUSKIE called Co-Conspirator 2.  The call was connected for approximately 16 minutes.

53.     On or about November 21, 2022, WILLIAMSON or someone acting at her direction emailed an invoice for $32,500 to Law Firm 1 requesting payment for "Consulting" "Account maintenance" for September to December 2022.

54.     On or about December 5, 2022, a Company C employee emailed WILLIAMSON asking if McCluskie's spouse could be switched from an employee to a 1099 contractor.

55.     On or about January 2, 2023, WILLIAMSON emailed Campbell, Co-Conspirator 2, and a Company C employee stating, "[Co-Conspirator 2] will invoice [Public Official 1's] campaign for $10,000 per month via [Company B]" so Co-Conspirator 2 can "cover [McCluskie's spouse's] contract ($120,000)."

56.     On or about January 24, 2023, WILLIAMSON emailed Lawyer 1, copying Co-Conspirator 2, stating "Hi – Including [Co-Conspirator 2]; [he/she] will be your contact going forward. Invoices will now be for $12,500/mo. per [McCluskie's initials].  D."

57.     On or about January 24, 2023, WILLIAMSON emailed McCluskie's spouse and Co-Conspirator 2, stating "[McCluskie spouse] – Please meet [Co-Conspirator 2] who will be handling your invoices going forward.  Dana."

58.     On or about January 24, 2023, McCluskie's spouse sent an email to a Company C employee clarifying that it was $10,000 per month, not $12,500.

59.     On or about January 24, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

60.     On or about January 24, 2023, McCluskie approved Co-Conspirator 2's first invoice for "consulting services" to the dormant campaign.

61.     On or about January 30, 2023, a Company C employee sent an email to Campbell and Co-Conspirator 2, stating "Below is the February contribution to [Company C]: [Co-Conspirator 2]: $10,700 + $10,000 (Feb [McCluskie's spouse] = **$20,700**"

62.     On or about February 15, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

63.     On or about February 17, 2023, McCluskie responded to Law Firm 1's request to "auto-pay" the "monthly invoices from [Company B] moving forward" by declining that request and instead, informing it that McCluskie's spouse would be taking over for him as the person handling the invoice approvals for the payments sought by, or on behalf of, Co-Conspirator 2 and Company B.

64.     On or about February 21, 2023, a Company C employee emailed Campbell and Co-Conspirator 2, asking: "Greg . . . —let me know if you'd like me to transfer [the funds].  [Co-Conspirator 2]: $10,700 + $10,000 (March [MCCLUSKIE's spouse]) = $20,700 (I invoiced [Lawyer 1] on 2/14 for March so you should receive payment soon.)"

65.     On or about February 21, 2023, Co-Conspirator 2 responded by email to the Company C employee and Campbell that, "I will write a check once I get the funds from [Lawyer 1]!"

66.     On or about March 1, 2023, McCluskie's spouse again refused to give "approval to automatically pay the monthly [Company B] invoices" and instead, had Law Firm 1 "continue to send the invoices to [her] for approval."

67.     On or about March 3, 2023, a Company C employee emailed McCluskie's spouse

1 explicitly linking the payments from the campaign to the pass-through payments:

2         I wanted to touch base and let you know that I'm awaiting payment from
3         the campaign, then I'll send your monthly fee. I expect it will be early next
        week.  Going forward, would you prefer that I send the payment when I
4         receive payment from the campaign, or would you prefer that I just send it
        at the end of the month.  Just let me know.  Thank you[.]

5       68.    On or about March 3, 2023, McCluskie's spouse responded to the Company C

6 employee's email regarding timing of payments and said, "It would be great if you would s[end] the fee

7 when you receive payment from the campaign.  Thanks and have a nice weekend".

8       69.    On or about April 12, 2023, Co-Conspirator 2 caused a Company C employee to email an

9 invoice for "consulting services" to Law Firm 1.

10       70.    On or about June 14, 2023, Co-Conspirator 2 caused a Company C employee to email an

11 invoice for "consulting services" to Law Firm 1.

12       71.    On or about April 15, 2024, Co-Conspirator 2 caused a Company C employee to email an

13 invoice for "consulting services" to Law Firm 1.

14       72.    On or about April 19, 2024, WILLIAMSON emailed Lawyer 1, approving a statement

15 for Lawyer 1 to release to a reporter as follows:

16         [Co-Conspirator 2] has been paid to oversee the Committee and manage its
17         operations while [Public Official 1] has been serving in Washington, including
        payment of ongoing expenses and filing of required campaign reports.
18
        [Co-Conspirator 2] has continued to provide committee management services this
19         year and has been paid for those services.

20       73.    On or about May 6, 2024, a Company C employee acting at the direction of Co-

21 Conspirator 2 emailed McCluskie's spouse a backdated work contract, which purported to have been

22 entered in January 2023, asking McCluskie's spouse to, "please sign and return."

23       74.    On or about May 9, 2024, McCluskie called WILLIAMSON.  WILLIAMSON did not

24 answer.

25       75.    Approximately five minutes later, on or about May 9, 2024, WILLIAMSON called

26 McCluskie.  The call connected for approximately three minutes during which WILLIAMSON said she

27 would take care of the backdated contract with Co-Conspirator 2.

28       76.    On or about June 13, 2024, Co-Conspirator 2 caused a Company C employee to email an

1 | invoice for "consulting services" to Law Firm 1.

2 |      77.    On or about July 15, 2024, Co-Conspirator 2 emailed an invoice for "consulting services"

3 | to Law Firm 1.

4 |      78.    On or about July 29, 2024, WILLIAMSON, Campbell, and Co-Conspirator 2 met at a bar

5 | near the California State Capitol and discussed ending the scheme.  During the conversation, Campbell

6 | explained the need to obfuscate the connection between the payments from the campaign accounts and

7 | the payments to McCluskie's spouse stating, in part, that: "we need to probably eat one or two months

8 | so it doesn't line up directly from when you quit and stop paying her" and "whenever you quit we

9 | probably have to at least pay one month or otherwise it's going to look—it's going to just raise red flags

10 | potentially."

11 |      79.    On or about August 2, 2024, Campbell and Co-Conspirator 2 met at Company C's

12 | business location in Sacramento, California.  Campbell discussed ending the scheme and stated that it

13 | was "always set up to be somewhat icky," amounted to "laundering money," and was "wrong."

14 |      80.    On or about August 29, 2024, McCluskie and Co-Conspirator 2 spoke on the phone about

15 | Co-Conspirator 2 stopping payments.  During this conversation, McCluskie asked Co-Conspirator 2 to

16 | continue the arrangement for a time so he could "transition out" of his federal job and try to get his

17 | "pension out of the federal government."  He explained that the "money that you guys are giving me is

18 | helping me fly back and forth to to uh DC and live there half part time."

19 |      All in violation of Title 18, United States Code, Section 1349.

20 | <u>COUNTS TWO THROUGH TWELVE</u>: [18 U.S.C. § 1344 – Bank Fraud]

21 |      The Grand Jury further charges:

22 |                     DANA WILLIAMSON,

23 | defendant herein, as follows:

24 |               **I.**      **SCHEME TO DEFRAUD**

25 |      1.    Paragraphs 1 through 12 of Count 1 of the Indictment are realleged and incorporated

26 | herein, as if fully set forth.

27 |      2.    Between in or about February 2022 through in or about September 2024, in the State and

28 | Eastern District of California and elsewhere, WILLIAMSON and others known and unknown to the

1    Grand Jury knowingly devised, participated in, and executed, a material scheme to defraud and obtain

2    money by means of materially false and fraudulent pretenses, representations, promises, and omissions,

3    and the concealment of material facts.

4         3.    The purpose of the scheme to defraud was to take money from Public Official 1's

5    dormant campaign accounts and convert it to McCluskie's personal use.  In total, the co-conspirators

6    diverted approximately $225,000 from the dormant campaign accounts in furtherance of the scheme.

7                   II.    **MANNER AND MEANS**

8         In furtherance of the scheme to defraud, the defendants employed, among others, the following

9    manner and means:

10        4.    Paragraphs 15 through 32 of Count 1 of the Indictment are realleged and incorporated

11   herein, as if fully set forth.

12           III.    **EXECUTION OF THE SCHEME AND ARTIFICE TO DEFRAUD**

13        On or about the dates set forth below, in the State and Eastern District of California, and

14   elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, and

15   attempting to do so, WILLIAMSON, and others known and unknown to the Grand Jury, knowingly

16   executed and attempted to execute the scheme and artifice to defraud financial institutions and to obtain

17   monies, funds, credits, assets, securities, and other property owned by and under the custody and control

18   of the financial institutions as further set forth below:

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

INDICTMENT                                       16

| Count | Approximate Date | Description |
|---|---|---|
| 2 | August 19, 2022 | A check issued in the amount of $45,000, which drew from account -9251 at Bank 1 that was eventually deposited at Bank 5 in account number -1742 by mobile deposit. |
| 3 | January 24, 2023 | A check issued in the amount of $20,000, which drew from account -2950 at Bank 1 that was eventually deposited at Bank 2 in account number -3963 by mobile deposit. |
| 4 | March 1, 2023 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 that was deposited at Bank 2 in account number -3963 by mobile deposit. |
| 5 | May 17, 2023 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 that was eventually deposited at Bank 2 in account number -3963 by mobile deposit. |
| 6 | July 18, 2023 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 that was eventually deposited at Bank 2 in account number -3963 at an ATM in Rancho Cordova, California. |
| 7 | July 21, 2023 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 that was deposited at Bank 2 in account number -3963 at an ATM in Rancho Cordova, California. |
| 8 | November 21, 2023 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 that was eventually deposited at Bank 2 in account number -3963 in a branch in El Dorado Hills, California. |
| 9 | December 27, 2023 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 that was eventually deposited at Bank 2 in account number -3963 at an ATM in Rancho Cordova, California. |
| 10 | March 15, 2024 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 that was eventually deposited at Bank 2 in account number -3963 at a branch in El Dorado Hills, California. |
| 11 | April 18, 2024 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 and was deposited at Bank 2 in account number -3963 at a branch in Sacramento, California. |
| 12 | June 14, 2024 | A check issued in the amount of $10,000, which drew from account -2950 at Bank 1 that was eventually deposited at Bank 2 in account number -3963 at an ATM located in Carmichael, California. |

All in violation of Title 18, United States Code, Sections 2 and 1344(2).

COUNTS THIRTEEN THROUGH EIGHTEEN: [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury further charges:

DANA WILLIAMSON,

defendant herein, as follows:

## I.      SCHEME TO DEFRAUD

1.      Paragraphs 1 through 12 of Count 1 of the Indictment are realleged and incorporated herein, as if fully set forth.

2.      Between in or about February 2022 through in or about September 2024, in the State and

1  Eastern District of California and elsewhere, WILLIAMSON and others known and unknown to the

2  Grand Jury knowingly devised, participated in, and executed, a material scheme to defraud and obtain

3  money by means of materially false and fraudulent pretenses, representations, promises, half-truths,

4  concealment, and omission of material facts for which there was a duty to disclose.

5       3.     The purpose of the scheme to defraud was to take money from Public Official 1's

6  dormant campaign accounts and convert it to McCluskie's personal use.  In total, the co-conspirators

7  diverted approximately $225,000 from the dormant campaign accounts in furtherance of the scheme.

8  **II.**    **MANNER AND MEANS**

9       In furtherance of the scheme to defraud, the defendants employed, among others, the following

10 manner and means:

11      4.     Paragraphs 15 through 32 of Count 1 of the Indictment are realleged and incorporated

12 herein, as if fully set forth.

13 **III.**    **USE OF WIRE COMMUNICATIONS**

14      On or about the dates set forth below, in the State and Eastern District of California, and

15 elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, and

16 attempting to do so, WILLIAMSON, and others known and unknown to the Grand Jury, knowingly

17 transmitted and caused to be transmitted by means of wire communications in interstate and foreign

18 commerce, certain writings, signs, signals, pictures, and sounds, and attempted to do so as further set

19 forth below:

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

INDICTMENT

| Count | Approximate Date | Description of Wire |
|---|---|---|
| 13 | March 28, 2022 | Email from WILLIAMSON to McCluskie with information to provide to ethics counsel regarding McCluskie's spouse's purported employment with Company A, including that McCluskie's spouse would be "Advising on digital ad placements and misc. communications for political campaigns." |
| 14 | August 19, 2022 | Email from McCluskie approving $45,000 payment to WILLIAMSON |
| 15 | January 24, 2023 | Email from WILLIAMSON to Lawyer 1, copying Co-Conspirator 2, and introducing Co-Conspirator 2 as the contact going forward. |
| 16 | January 24, 2023 | Email from WILLIAMSON to McCluskie's spouse and Co-Conspirator 2, stating "[McCluskie spouse] – Please meet [Co-Conspirator 2] who will be handling your invoices going forward. Dana." |
| 17 | February 1, 2023 | Wire transfer in the amount of $10,000 from Bank 4 account ending -9091 to Bank 3 account ending -7908. |
| 18 | April 19, 2024 | Email from WILLIAMSON to Lawyer 1, approving a statement for the Lawyer 1 to release to a reporter regarding Co-Conspirator 2's purported work for the dormant campaign account. |

All in violation of Title 18, United States Code, Sections 2 and 1343.

COUNT NINETEEN: [18 U.S.C. § 371 – Conspiracy to Interfere with Governmental Function and Obstruct Justice]

The Grand Jury further charges:

DANA WILLIAMSON,

defendant herein, as follows:

## I.  **INTRODUCTION**

At all times relevant to the Indictment:

1.    Paragraphs 1 through 3 of Count 1 of the Indictment are realleged and incorporated herein, as if fully set forth.

### A.    **The Small Business Administration and the Paycheck Protection Program**

2.    The United States Small Business Administration (the "SBA") was an agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

3.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law

first enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (the "PPP").

4.    To obtain a PPP loan, a qualifying business was required to submit a PPP loan application that was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

5.    Not all businesses could qualify for PPP loans or PPP loan forgiveness. PPP loans could not be used for lobbying activities or expenditures, nor could they be used for "expenditures designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive order proposed or pending before Congress or any State government, State legislature, or local legislature or legislative body." Title 15, United States Code, Section 636(a)(37)(F)(vi) (Eff. Dec. 31, 2020). Further, "any business concern or entity primarily engaged in political or lobbying activities" was expressly excluded as an "eligible entity" for the purpose of obtaining PPP second draw loans. Title 15, United States Code, Section 636(a)(37)(A)(iv)(III)(bb) (Eff. Dec. 31, 2020).

**B.    Civil Investigation of Williamson's PPP Loans**

6.    The SBA and the Civil Division of the United States Attorney's Office for the Eastern District of California investigated companies engaged in lobbying activity who also obtained PPP loans.

7.    WILLIAMSON's company, Company A, collected PPP funds and had one or more employees or principals whom public records indicated engaged in lobbying activity.

8.    In or about September 2023, the SBA and the Civil Division of the United States Attorney's Office for the Eastern District of California began investigating PPP loans obtained by WILLIAMSON's company, Company A.

9.    As part of that civil investigation, on or about January 16, 2024, Company A was served with a Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") subpoena. The subpoena requested documents related to Company A's eligibility for PPP loans, loan forgiveness, and

its revenue from lobbying activity.

## II.     THE CONSPIRACY AND ITS OBJECTS

10.     From in or about July 2024, through in or about August 2024, in Sacramento County, within the State and Eastern District of California, and elsewhere, WILLIAMSON did knowingly and intentionally combine, conspire, confederate, and agree with Campbell to interfere with the functions of the United States and an agency thereof, to wit, the United States Department of Justice and the SBA, and to commit offenses against the United States, to wit, to violate Title 18, United States Code, Section 1519.  The following were each objects of the conspiracy:

      a.     To interfere with governmental function by and through deceitful and dishonest means for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the Department of Justice and the SBA in investigating and enforcing civil violations of applicable federal law relating to PPP loans.

      b.     To impede, obstruct, and influence an investigation and the proper administration of justice of a matter within the jurisdiction of the United States Department of Justice and the SBA, and in relation to or in contemplation of any such matter or case, by altering, destroying, concealing, covering up, falsifying, and making false entry to a record, document, and tangible object, in violation of Title 18, United States Code, Section 1519.

## III.     MANNER AND MEANS

In furtherance of the conspiracy, the conspirators employed, among others, the following manner and means:

11.     On or about July 29, 2024, WILLIAMSON arranged for WILLIAMSON, Campbell, and Co-Conspirator 2 to meet at a restaurant and bar near the California State Capitol.

12.     During the July 29, 2024 meeting, WILLIAMSON discussed the FIRREA subpoena from the United States, stating among other things that: "I'm still in this like fucking, my PPP loan got popped bullshit."  WILLIAMSON asked for Campbell's help creating a contract she could submit in response to the subpoena, documenting the purported business relationship between Company A and Company D, even though WILLIAMSON and Campbell never had one for those companies. WILLIAMSON asked Campbell to have "[a Company C employee] do like a retroactive one" and that

WILLIAMSON would "text you like the years" she needed. WILLIAMSON told Campbell that the contract should "say that you were sub-contracting with me to provide general advice, umm, to your clients, there w—there's no lobbying or influence or anything like that."

13.    Campbell agreed and told WILLIAMSON to, "just shoot me a text with what you need it to say, and I'll go ta, go see [the Company C employee] right after this."

14.    On or about July 30, 2024, WILLIAMSON texted Campbell, "On the contracts, I need 3 (2019, 2020, 2021) of the same that says [Company A] is sub to various clients of campbell to provide strategic advice. [Company A] is prohibited from providing any lobbying services." Campbell replied, "On it" and then "Do we need amounts?"

15.    Campbell then instructed a Company C employee to create the three contracts. The Company C employee did so that day. Campbell, or an employee acting at his direction, backdated the contracts to falsely indicate that they were executed in 2019, 2020, and 2021. The backdated contracts also contained false statements about WILLIAMSON and Campbell's business arrangement, including stating that Company A was not engaging in lobbying activity and misrepresenting that Company A was a subcontractor for Company D when in truth they both did work for shared clients. This reciprocal work arrangement included WILLIAMSON offering lobbying services provided by Campbell to her clients. These statements were intended to make the contracts look like legitimate contracts that had been entered into at the time the services were provided, and to make it appear that Company A was eligible to receive PPP loans and loan forgiveness.

16.    WILLIAMSON texted Campbell later that day, on or about July 30, 2024, that she did not think the contracts needed amounts, and Campbell agreed, adding: "They are all done and here for you when you get a chance. Call me for details if/when you can."

17.    On or about July 31, 2024, WILLIAMSON and Campbell arranged by text message for WILLIAMSON to pick the contracts up in person from the Company C offices, which WILLIAMSON did.

## IV.    OVERT ACTS

In furtherance of said conspiracy and to accomplish its objects, at least one of the conspirators committed, or caused to be committed, in the State and Eastern District of California, the following

1    overt acts, among others:

2         18.    On or about July 30, 2024, WILLIAMSON texted Campbell, stating "I need 3 (2019,

3    2020, 2021)."

4         19.    On or about July 30, 2024, Campbell instructed an employee to create three contracts for

5    WILLIAMSON.

6         20.    On or about July 31, 2024, WILLIAMSON and Campbell exchanged text messages about

7    picking up the contracts from Campbell.

8         21.    On or about July 31, 2024, WILLIAMSON picked up the contracts from Campbell.

9         All in violation of Title 18, United States Code, Section 371.

10   COUNT TWENTY: [26 U.S.C. § 7206(1) – Subscribing to a False Tax Return]

11        The Grand Jury further charges:

12                          DANA WILLIAMSON,

13   defendant herein, as follows:

14        1.    On or about October 10, 2022, in the State and Eastern District of California,

15   WILLIAMSON did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for

16   the calendar year 2021, which was verified by a declaration that it was made under the penalties of

17   perjury and which she did not believe to be true and correct as to every material matter in that

18   WILLIAMSON knew that she underreported her business income on Lines 28A and 41 of Schedule E

19   and Line 8 of her Individual Income Tax Return Form 1040.

20        2.    As WILLIAMSON then and there well knew, the amounts reported on Lines 28A and 41

21   of Schedule E and Line 8 of her Form 1040 had been reduced by approximately $160,201 in false

22   business deductions reported on Company A's U.S. Income Tax Return for an S Corporation, Form

23   1120-S, for what were in reality WILLIAMSON's personal expenditures.

24        3.    The false business deductions based on what were really WILLIAMSON's personal

25   expenditures included, but were not limited to:  a $15,353 Chanel handbag and ring; a $5,818 Fendi

26   handbag and wallet; a $19,498 HVAC system at WILLIAMSON's personal residence; a $10,000

27   payment to one of WILLIAMSON'S relatives; a $9,589 watch for a close friend; a $6,324 couch for

28   WILLIAMSON's personal residence; a $21,175 private jet charter; and a $15,662 luxury hotel stay for

1  WILLIAMSON's birthday.

2       All in violation of Title 26, United States Code, Section 7206(1).

3  COUNT TWENTY-ONE: [26 U.S.C. § 7206(1) – Subscribing to a False Tax Return]

4       The Grand Jury further charges:

5                          DANA WILLIAMSON,

6  defendant herein, as follows:

7       1.     On or about September 11, 2023, in the State and Eastern District of California,

8  WILLIAMSON did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for

9  the calendar year 2022, which was verified by a declaration that it was made under the penalties of

10 perjury and which she did not believe to be true and correct as to every material matter in that

11 WILLIAMSON knew that she underreported her business income on Lines 28A and 41 of Schedule E

12 and Line 8 of her Individual Income Tax Return Form 1040.

13      2.     As WILLIAMSON then and there well knew, the amounts reported on Lines 28A and 41

14 of Schedule E and Line 8 of her Form 1040 had been reduced by approximately $861,033 in false

15 business deductions reported on Company A's U.S. Income Tax Return for an S Corporation, Form

16 1120-S, for what were in reality WILLIAMSON's personal expenditures, claimed business expenditures

17 for pension expenses that were not actually paid, and other nondeductible expenses.

18      3.     The false business deductions based on what were really WILLIAMSON's personal

19 expenditures, as well as other nondeductible expenses, included, but were not limited to:  $156,302 for a

20 luxury hotel stay and activities in Mexico to celebrate WILLIAMSON's birthday; a $11,100 yacht rental

21 in Mexico; $4,037 for a second luxury hotel stay in Mexico; $12,437 for Chanel earrings and a shopping

22 bag; $35,550 to a family law attorney; $7,712 for a Gucci bag and wallet; $10,620 for a trip to a

23 California theme park; $100,000 as purported salary for Co-Conspirator 5's no-show job; and $4,083 for

24 a moving company.

25      All in violation of Title 26, United States Code, Section 7206(1).

26 ///

27 ///

28 ///

COUNT TWENTY-TWO: [26 U.S.C. § 7206(1) – Subscribing to a False Tax Return]

The Grand Jury further charges:

DANA WILLIAMSON,

defendant herein, as follows:

1.      On or about July 16, 2024, in the State and Eastern District of California, WILLIAMSON did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2023, which was verified by a declaration that it was made under the penalties of perjury and which she did not believe to be true and correct as to every material matter in that WILLIAMSON knew that she underreported her business income on Lines 28A and 41 of Schedule E and Line 8 of her Individual Income Tax Return Form 1040.

2.      As WILLIAMSON then and there well knew, the amounts reported on Lines 28A and 41 of Schedule E and Line 8 of her Form 1040 had been reduced by approximately $697,043 in false business deductions reported on Company A's U.S. Income Tax Return for an S Corporation, Form 1120-S, for what were in reality WILLIAMSON's personal expenditures and other nondeductible expenses.

3.      The false business deductions based on what were really WILLIAMSON's personal expenditures, as well as other nondeductible expenses, included, but were not limited to: $105,769 to a relative for purported work at a no-show job; and $118,154 to a second relative for purported work at a no-show job.

All in violation of Title 26, United States Code, Section 7206(1).

COUNT TWENTY-THREE: [18 U.S.C. § 1001(a)(2) – Making False Statements]

The Grand Jury further charges: T H A T

DANA WILLIAMSON,

defendant herein, on or about November 14, 2024, in the State and Eastern District of California, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the government of the United States, to wit: the United States Department of Justice, Federal Bureau of Investigation ("FBI"), in that during an interview with FBI Special Agents related to ongoing FBI investigations of allegations concerning,

among other matters:

(a) WILLIAMSON's involvement in conduit payments from Public Official 1's dormant campaign accounts;

(b) backdated contracts created in response to a subpoena to WILLIAMSON's company in a civil PPP loan investigation; and

(c) WILLIAMSON's actions while serving in public office to influence litigation involving the State of California and a former client—Corporation 1—and pass information regarding the litigation to Corporation 1's operatives, in a manner beneficial to Corporation 1, an executive of Corporation 1, and some of her former business partners.

The statements WILLIAMSON made to the FBI were false as follows:

### False Statement 1

WILLIAMSON falsely stated that there was no connection between Public Official 1's campaign's payments to WILLIAMSON and WILLIAMSON's payments to McCluskie's spouse.

In truth and in fact, as WILLIAMSON then well knew, there was a connection between Public Official 1 campaign's payments to WILLIAMSON and the payments to McCluskie's spouse. Specifically, WILLIAMSON and McCluskie orchestrated the payments from Public Official 1's campaign to WILLIAMSON to subsidize WILLIAMSON's payments to McCluskie's spouse.

### False Statement 2

WILLIAMSON falsely stated that there was no connection between Public Official 1's campaign's payments to Co-Conspirator 2 and Company C's payments to McCluskie's spouse. She further stated that the money going to McCluskie's spouse was not coming from Public Official 1's campaign accounts.

In truth and in fact, as WILLIAMSON then well knew, the payments from Public Official 1's campaign to Co-Conspirator 2 were connected to Co-Conspirator 2's payments to McCluskie's spouse. Specifically, the payments from the dormant campaign accounts were passed through for McCluskie's benefit.

### False Statement 3

WILLIAMSON falsely stated that the last time she spoke to Lawyer 1 was around the time

National News Organization 1's article was published in or about April 2024.

In truth and in fact, as WILLIAMSON then well knew, WILLIAMSON had spoken to Lawyer 1 in August 2024, well after the news article was published.

False Statement 4

WILLIAMSON falsely stated that the last time that she talked to Co-Conspirator 2 about Public Official 1 or Public Official 1's campaign was when National News Organization 1's article was published in or about April 2024.

In truth and in fact, as WILLIAMSON then well knew, WILLIAMSON had, in fact, spoken to Co-Conspirator 2 about Public Official 1 and the campaign on several occasions since the news article was published, including on or about July 29, 2024, and, only two days before the FBI interview, on or about November 12, 2024, as discussed below.

False Statement 5

WILLIAMSON falsely stated that when she met with Co-Conspirator 2 two days earlier, she had not spoken to Co-Conspirator 2 about McCluskie, McCluskie's spouse, or Public Official 1.

In truth and in fact, as WILLIAMSON then well knew, WILLIAMSON had spoken to Co-Conspirator 2 about McCluskie, McCluskie's spouse, and Public Official 1 in a recorded conversation two days before being interviewed by the FBI.

False Statement 6

WILLIAMSON falsely stated that she did not tell Greg Campbell what information to put in the backdated contracts and that she only told Campbell what time period the contracts needed to cover.

In truth and in fact, as WILLIAMSON then well knew, WILLIAMSON had told Campbell what information he should put in the backdated contracts she asked him to create, including that they should "say that you were subcontracting with me to provide general advice, umm, to your clients, there w— there's no lobbying or influence or anything like that."

False Statement 7

WILLIAMSON falsely stated that while serving in public office, generally, except for information involving potential government contracts for her former client, Corporation 2, she did not pass any inside California State government information to members of Company C.

In truth and in fact, as WILLIAMSON then well knew, WILLIAMSON had passed California State government information to members of Company C that was related to the state's litigation against Corporation 1. Corporation 1 was WILLIAMSON's former client and Co-Conspirator 2's current client. WILLIAMSON and Co-Conspirator 2 often referred to it in coded language as "that thing" or "that one thing." WILLIAMSON, contrary to what she told the FBI in November 2024, had revealed inside government information in conversations including but not limited to the following:

(a) In or about January 2023, WILLIAMSON told Co-Conspirator 2 that WILLIAMSON told a high-level government attorney to move the litigation to a different part of the state government and get it settled.

(b) In or about April 2023, WILLIAMSON sent Co-Conspirator 2 information about a state government attorney who had been fired in connection with the litigation and then followed up with phone conversations.

(c) In or about October 2023, WILLIAMSON shared with Co-Conspirator 2 information about a conversation she had with a member of the state legislature related to Corporation 1.

(d) In or about June 2024, WILLIAMSON disclosed to Co-Conspirator 2 that an individual had submitted a California Public Records Act ("PRA") request seeking the production of documents related to Corporation 1 and its litigation with the state, and WILLIAMSON confirmed she expected a government employee who oversaw that litigation would be fired. That conversation is transcribed in part below:

| | |
|---|---|
| WILLIAMSON: | So fuckin umm, the [PRA request submitter] PRA us all for any communications with, ummm [Corporation 1], [Lobbyist], Campbell, blah, blah, blah. |
| . . . | |
| WILLIAMSON: | The funnier part was it was like any communications and meetings with Greg Campbell, and I'm like, and then the way that she wrote it could mean capture every, like, all of the meetings just cause she like disconnected representatives from she's a third point, and so I was like well I am fucked if I have to produce all of that. I talk to those assholes all the time! |
| Co-Conspirator 2: | Right. Also like, fuck her. |
| WILLIAMSON: | Yeah, I know, fuck her. Double fuck her. |
| Co-Conspirator 2: | I mean, the [PRA recipient office] should play the same fucking game |

|  |  |  |
|---|---|---|
| 1 |  | they played and make them wait three years. |
| 2 | WILLIAMSON: | Yeah, well, we don't have any responsive documents. |
| 3 | Co-Conspirator 2: | Oh, even better. I love that [laughs]. Umm, okay, well that's good to |
| 4 |  | know. Is [government official connected to the Corporation 1 litigation] still gonna get fired? |
| 5 | WILLIAMSON: | He sure is! |
| 6 | Co-Conspirator 2: | Okay. |
| 7 |  | . . . |
| 8 | WILLIAMSON: | Alright, well I just wanted to alert you to the PRAs that we're starting to |
| 9 |  | get, and, yay. |
|  | Co-Conspirator 2: | Yeah okay. I wonder what her deal is. |
| 10 | WILLIAMSON: | I don't know. Her name is [First name] [Unintelligible] [First and last |
| 11 |  | name] |
| 12 | [discussion of possible motives for the PRA request] |  |
| 13 | WILLIAMSON: | Or maybe that like the settlement conversation [Unintelligible] a little bit |
| 14 |  | odd like [government official connected with the Corporation 1 litigation] complained and she's, you know, very blatantly doing it on his behalf, |
| 15 |  | who knows. |
|  | Co-Conspirator 2: | Yeah. Ugh. Fuck her. They don't really know who they are messing |
| 16 |  | with. |
| 17 | WILLIAMSON: | They really don't. It's bad for them. |
| 18 | Co-Conspirator 2: | Yeah – |

All in violation of Title 18, United States Code, Section 1001(a)(2).

FORFEITURE ALLEGATION:          [18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A), 982(a)(3), 26 U.S.C. §§ 7301, 7302, and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

1.      Upon conviction of the offense alleged in Count One of this Indictment, defendant DANA WILLIAMSON shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violation, including but not limited to the following:

        a.      A sum of money equal to the total amount of proceeds traceable to such offense, for which defendant is convicted.

2.      Upon conviction of one or more of the offenses alleged in Counts Two through Twelve

of this Indictment, defendant WILLIAMSON shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(2)(A), any property which constitutes or is derived from proceeds obtained directly or indirectly, as a result said violations, including but not limited to the following:

        a.     A sum of money equal to the total amount of proceeds obtained directly or indirectly, as a result of such offenses, for which defendant is convicted.

3.     Upon conviction of one or more of the offenses alleged in Counts Thirteen through Eighteen of this Indictment, defendant WILLIAMSON shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(2), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including but not limited to the following:

        a.     A sum of money equal to the total amount of gross receipts traceable to the offenses, for which defendant is convicted.

4.     Upon conviction of one or more of the offenses alleged in Count Twenty through Twenty-Two of this Indictment, the defendant shall forfeit to the United States, pursuant to 26 U.S.C. §§ 7301 and 7302 and 28 U.S.C. § 2461(c), any property any property used, or intended to be used, in the commission of the offense for which defendant is convicted.

5.     Upon conviction of the offense alleged in Count Twenty-Three of this Indictment, defendant WILLIAMSON shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(3), all property, real and personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such violation, including but not limited to the following:

        a.     A sum of money equal to the total amount of proceeds traceable to the offense, for which defendant is convicted.

6.     If any property subject to forfeiture, as a result of the offenses alleged in Counts One through Eighteen and Twenty through Twenty-Three of this Indictment, for which defendant is convicted:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

1         e.    has been commingled with other property which cannot be divided without

2             difficulty;

3  it is the intent of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c),

4  incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendant, up to the value

5  of the property subject to forfeiture.

6

7                                     A TRUE BILL.

8                                   /s/ Signature on file w/AUSA

9

10  *Eric Grant*

11  ERIC GRANT

12  United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                                FOREPERSON

INDICTMENT

*No.* _ _ _ _ _ _ _ _ _ _

## UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

THE UNITED STATES OF AMERICA

*vs.*

**No Bail Warrant Pending Hearing**

DANA WILLIAMSON,

## I N D I C T M E N T

**VIOLATION(S):**  18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud and Wire Fraud;
18 U.S.C. § 1344 Bank Fraud (11 Counts); 18 U.S.C. § 1343 – Wire Fraud (6 Counts);
18 U.S.C. § 371 – Conspiracy to Interfere with Governmental Function and Obstruction Justice;
26 U.S.C. § 7206(1) – Subscribing to False Tax Return (3 Counts);
18 U.S.C. § 1001(a)(2) - False Statements; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A),
982(a)(3), 26 U.S.C. §§ 7301, 7302, and 28 U.S.C. § 2461(c) – Criminal Forfeiture

*A true bill,*          **/s/ Signature on file w/AUSA**

_____
                    *Foreman.*

*Filed in open court this* _ _**November**_ _ _ _ _ *day*

*of* _ _ _ **07** _ _ _ _ _ _ _ _ _ _ , *A.D. 20* **25** _ _ _

                    /s/ Chris Nair
_____
                        *Clerk.*

**No Bail Warrant Pending Hearing**

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Cardh M. Delany

GPO 863 525

## United States v. Dana Williamson
### Penalties for Indictment

### COUNT 1:

VIOLATION:         18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud and Wire Fraud

PENALTIES:         Up to 20 years in prison; or
Fine of up to $250,000 or the greater of twice the gross gain or loss; or
both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory)

### COUNTS 2-12:

VIOLATION:         18 U.S.C. § 1344 – Bank Fraud

PENALTIES:         Up to 20 years in prison; or
Fine of up to $250,000 or the greater of twice the gross gain or loss; or
both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT:  $100 (mandatory on each count)

### COUNTS 13-18:

VIOLATION:         18 U.S.C. § 1343 – Wire Fraud

PENALTIES:         Up to 20 years in prison; or
Fine of up to $250,000 or the greater of twice the gross gain or loss; or
both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT:  $100 (mandatory on each count)

### COUNT 19:

VIOLATION:         18 U.S.C. § 371 - Conspiracy to Interfere with Governmental Function and Obstruct Justice

PENALTIES:         Up to 5 years in prison; or
Fine of up to $250,000 the greater of twice the gross gain or loss; or both
fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory)

## COUNTS 20-22:

VIOLATION:          26 U.S.C. § 7206(1)

PENALTIES:         Up to 3 years in prison; or
Fine of up to $100,000; or both fine and imprisonment
Supervised release of up to 1 year

SPECIAL ASSESSMENT:  $100 (mandatory on each count)

## COUNT 23:

VIOLATION:          18 U.S.C. § 1001(a)(2)

PENALTIES:         Up to 5 years in prison; or
$250,000 fine; or both fine and imprisonment
Supervised release up to 3 years

SPECIAL ASSESSMENT:   $100 (mandatory)

## FORFEITURE ALLEGATION:

VIOLATION:          18 U.S.C. §§ 981(a)(1)(C), 982(a)(2), 982(a)(3), 26 U.S.C. §§ 7301, 7302,
and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:         As stated in the charging document

2